So we'll proceed with argument in Levine v. Costco. Good morning. Good morning, Your Honors. My name is Matthew Hensley Pruitt on behalf of the Plaintiff's Appellants. We're here today because Costco sells canned chicken in a six-pack that is misleading to consumers who don't know how much chicken is in the actual can. Now, each six-pack has six 12.5-ounce cans. Inside of each can, there's only seven ounces of chicken, and it's swimming in five and a half ounces of water. And that's not clear to a consumer who's walking down the aisles. What if the consumer looks at the back of the can? Wouldn't it be clear then? Well, a slight distinction here. The package that wraps around each of the six cans is opaque, and it has a different nutritional facts label than each individual can. Now, the outer wrapper has a nutrition facts label that says two ounces drained. Now, defendants have said that this disclosure at the back would clarify the fact there's only seven ounces of chicken in each can because of the 12.5-ounce disclosure on the front. Now, if you're in the aisle and you're looking at this package, you have to figure, okay, there's two ounces in each serving, but this outer wrapper tells me that there's 21 ounces in all six cans. So you have to multiply two ounces times 21 servings. That gives you 42 ounces in total from all six packs. Then you have to figure, okay, that's six cans. So that's 42 divided by six gives me seven ounces in each of the can, and that leaves me with five and a half ounces of water in each 12-ounce can, 12-and-a-half-ounce can. So I think that this is a lot of steps that needs to be going through for a consumer's mind to determine this. In other words, it nowhere says anything like seven ounces of meat per can. It does not, Your Honor. Now, and I know that this is misleading. The word problem for a sixth grader would be something like, Costco sells a six-pack of cans of chicken packed in water with a total net weight of 4.6 pounds. The label on the back says the six-pack gives you approximately 21 two-ounce servings of chicken per ounce drained. How many ounces of actual chicken is there in each can? Yes, Your Honor. It's a little bit complicated. With a calculator and a pencil and paper, any sixth grader who's in the top 10 percent of his class could probably do that. And I think an important thing that Your Honor noted there is that it says drained. It says drained on the back. It doesn't say drained on the front. And somebody somewhere thought it was important to note that this is a drained weight. This is not the total weight of the chicken in the water per serving. So I guess that would be something like three ounces per serving if you counted both the chicken and the water on a pro rata basis in the can. But that's important information for somebody, and it's not on the front of the can. Of course, what Costco is arguing here is not actually that it's not misleading, right? They're arguing that it's preempted. Yes, Your Honor, by the submission to the FSIS pursuant to the PPIA. Now, I think it's important to look kind of more broadly at that review process. But I think an important Supreme Court case that elucidates the review process here is Bates v. Dow. In that case, the Supreme Court was evaluating a label on a pesticide pursuant to FIFRA. Now, that label was reviewed for the contents of the label. It wasn't necessarily reviewed for the efficacy of the pesticide at issue. But the Supreme Court noted that the states could have a claim that had the same enforcement as the standard in the federal regulation. The example that they gave there was if the state law claim was that the font had to be read in a certain size, that was okay, as long as that was exactly the same regulation as the federal government did. The state could enforce that. Had the particular label been approved? It had been approved. It had not been approved as to the efficacy, which is a distinction that defendants have made. But that is irrelevant to the content of the label itself. So that's gone through that proceeding. Did you understand how this procedure works? Because I don't, frankly. I looked at the paperwork that was submitted with the application. It's not clear to me that an actual can of chicken accompanies that application. Is there anything in the record that would answer that question? Well, this is a motion to dismiss at the moment, Your Honor, and so there's not a fully developed factual record. But my understanding is that the actual physical can is not sent to the FSIS, but a representation of the label that would be applied to the can is sent. So how would we get to consider any of this information? I mean, did you allege that there's been an approval by the FSIS? No, Your Honor. I've alleged that this practice violates each of the three states' consumer protection statutes, and the way that we know that it's misleading is by the guidance that we have through the regulation. So we're being asked to take judicial notice of the process and to assume, as some other courts have done, that if the can is on a shelf, it must have been approved, the label must have been approved. Is that your understanding of how this gets before us? That is my understanding, Your Honor. And this particular paperwork, which I'm not sure. Yes, it's at the joint appendix. I'm sorry, I got a hole punched through the page number, but it's in the joint appendix. How did that get there? Well, Your Honor, on the motion to dismiss, defendants filed a document purporting to be the label that was submitted and requested judicial notice of that document. In our opposition papers, we note on the motion to dismiss below, we noted that there are some inconsistencies in the document itself. Then in the reply brief submitted by the defendants on the motion to dismiss below, they attached another document that purported to be a complete set of the document that was submitted to FSIS. In the motion to dismiss opinion, Judge Roman determined that he would not take judicial notice of the actual document, but rather of the fact that there was a review process. Okay. And do you understand on one of the pages of that paperwork, there is a part of the form asks about processing procedures, and step one is that the chicken is injected with marinade to target pickup of 20 percent. Is it your understanding, I guess I should be asking Cusco what their argument is, but I'm trying to figure out if you know what his argument is. Is it your understanding that the argument is that the chicken itself is no more than 20 percent water, as opposed to the contents of the can is no more than 20 percent water? Because then there's a later step in the process that says flood cans with appropriate amount of water. It is not clear that the FSIS is told what an appropriate amount of water is, but it's an appropriate amount. So is it your understanding that that's different than the 20 percent of liquid that is somehow absorbed into the chicken? I can't speak to that, Your Honor. My only guess is that it's an inflation of the chicken, if you will, if it's injected into it, but I can't speak to that. That's what it sounds like, and since it is 20 percent, I guess we'll ask them what their theory is. But I noticed that you didn't say anything about that, and so I was just wondering if you understood that to be their theory, because it's not very clear. And I think, Your Honor, in the reply brief to the motion to dismiss, defendants noted that in order to prove that they've satisfied the requirements of the regulation, that we could do that through discovery. Again, that's not appropriate in a motion to dismiss. So maybe these answers could come out. We could find out exactly how the process supposedly satisfies this. If we had discovery. If we had discovery. But we haven't heard a clear articulation yet about why they independently satisfy the standards as articulated by the USDA. May I ask a question just independent of the labeling claim? I understand that you have a separate claim that I guess is called a slack fill claim. In other words, that there's something misleading about the presentation of the size of the can that might lead a consumer to think there's less chicken in there. Can you articulate that and whether it is freestanding from the labeling claim? It's not necessarily freestanding, Your Honor. I think that a lot of the case law talks about how we need to look at the totality of the circumstances regarding the product that the consumer is purchasing. And if you look at everything together, you look at the fact that the label doesn't disclose how much water is in there versus how much chicken is in there. The fact that it's a pretty large can, it's 12 and a half ounces. That's not a small hockey puck that you might get for like a tuna can, right? It's a larger can than normal. And it's heavy. You pick the whole thing up. The overall impression is what I was trying to get to with respect to the argument regarding slack fill, that a consumer would not be expected to understand that almost half the can is chicken, is water. Sorry. Almost half the can is water. Often in the slack fill cases, there's dead space. And here there's chicken and water but no claim of other dead space. And I guess the question from a slack fill perspective is if you're allowed to consider the back of the can, how is the consumer misled? And maybe the answer is you're not. The point of shopping is before you're able to look at the back of the can. It's occluded. Well, I agree with that last point, Your Honor. The point is that in slack fill for the air is that it's nonfunctional. It's only to the extent that it's nonfunctional, correct, and it's not useful to the consumer. Here the instructions that Costco gives to a consumer is to drain the chicken. You're supposed to pour the water down the drain. That is water that does not add value to the consumer. So I think that's the same idea of this is nonfunctional, nonbeneficial product included in the can. Okay. And you've reserved two minutes for rebuttal, counsel. Yes, Your Honor. We'll hear from Mr. Withrow. Thank you. Good morning. My name is Bill Withrow. I represent Costco in this appeal. I'd like to begin by, well, let me back up and say there are three reasons that we provide in our brief for affirming the district court. I'd like to talk about the one that has, I think, drawn the most questions this morning and also the one that provides an independent grounds for affirming regardless of how you view the express or implied preemption arguments. And that's really the point that he makes initially where he says that the consumer doesn't know how much chicken is in the can, and that's really just not the case. And that's why the district court judge dismissed these state law claims on their merits. Now, there is information on the outside package. This is six cans wrapped in a shrink wrap, something on the front, something on the back, and then there's stuff on the can itself once you open the package. What we're doing in this case is relying solely on the information that's on the outside of the package. On the shrink wrap. That's correct, Your Honor. And so what it says on the front is that it's premium chunk chicken breast with water. So, I mean, there's a clear denomination on the front of the package that this product has water in the can. Secondly, on the back, on the nutrition facts section on the back of the shrink wrap, it says that there are 21 servings, two ounces per serving of drained chicken. But, of course, a consumer looks at the nutritional information for things like how many calories are in a typical serving and is there too much salt for my doctor's recommended diet, do I get any protein with this, and that sort of thing. That's what nutrition information is on the label for, is it not? Well, no. In other words, is the nutrition label where you look when you're buying something in a grocery store to determine how much food total is in the can? Well, yes, Your Honor. Do you know anybody who does that actually really? Well, I don't know anybody who buys this. But you do. Well, Your Honor, look, this is the standard here is that of a reasonable consumer. And the reasonable consumer looks to the nutritional information in order to do a math problem to figure out is the can mostly water. That's what you're telling me? That's where the reasonable consumer would look to determine what the net weight of meat in the can is? Well, yes, Your Honor, I do think that's right. I mean, you have to put this information on the package. It's required. The net weight is required by federal regulations. You're required to list the net weight. And where the product is a mixture of solid and liquid, the federal regulations require you to list the net weight, which this package did. Do the regs tell you where to put that information? No, Your Honor. It doesn't say. It just says it has to be. And the one thing the courts have said is that you have to look, you can't look at just one tile in the mosaic. You can't look just at one snippet, although in this case, the name of the product clearly indicates that there's water here. Yeah, but the name of the product, according to the PPIA regulations, perhaps should be chicken with 44% water. Is that not correct? No, Your Honor, I don't think that's right. And is that, did I understand the argument correctly? Because it's not very clear in the brief. Is your argument actually that the only water that counts is the water that's injected into the chicken in the form of marinade, according to that processing formula? Is that why you say there's less than 20% chicken? No, Your Honor. When that, and if you'll look at the form that is a part of the reply brief, and by the way, the issue that they had with the copy that was initially in the records, it was missing two pages. That's our fault. That's on us. But then in the reply brief, we submitted the entire complete copy. And I looked at the entire complete copy. So you can tell me anything you want to tell me, and I've got it right. Well, I am so glad you did, because what it says is that, and this regulation deals with the product formula when it is prepared. When this product is put into the can, as the form indicates, it is 83.3% chicken. When the meat is put into the can, the meat is 88% chicken. 83.3% chicken. And then water is poured in. Water. The rest, approximately 16.7% of water and other ingredients. And why is that not part of the preparation, since preparation is defined in the regulations to include the canning? Right. Well, the reason, and this is, again, not evident, but this is the sense of the regulation is this is a product. The chicken is cooked. It is chilled. It is put back in the can. The chicken meat is there. Water is added, and then the can is sealed, and then it goes through a cooking process, and that leads to the reduction. That's how you get from 83.3% when it's put in the can. Then the can is cooked and heated. That's what gives it the long shelf life. The can is cooked? Yes, it is heated. Now, again, that's not in the record. I'm not suggesting it is, but I'm just telling you. And where does the water go? You know, I'm not a science person, Your Honor. All I know is there's 83% of meat in the can. It does include marinade. That's right. Well, it says that you put chicken and you inject marinade with a target absorption of 20%. That's what it says on what you submitted, your client submitted, to the FSIS. Right. Right? I guess I'm trying to figure out, is that why it's 83% chicken, because it also contains water inside the chicken itself? It contains marinade, yes. It contains marinade. But the content of the chicken at the time it is placed in there is 83.3%, and then there's additional water and other seasonings added, and then it goes through this. It's actually called a retort process where it's heated, and that's what gives this product the extended shelf life. And then it's flooded with an appropriate amount of water. That's right. Is there a – I guess there's probably nothing in the record, given that you've cut this off without the development of any record. Is that why the – does the water serve any function in the heating? If that water weren't there, would the heating process not work properly? Well, we've gone way past my limited understanding. Well, I'm just wondering whether all of this is stuff that we should know about, and I don't blame you for not knowing it, but why isn't it appropriate to have some form of discovery process to allow us to better understand what the FSIS actually does when it approves an application like this, what the regulations actually are understood to require by the Department of Agriculture. We don't know any of this. What we know is that we've got a can that is more than 50% filled with water that, as far as the consumer is concerned, plays – is not part of what they're buying because it's supposed to be drained before use, right? This isn't chicken broth that the consumer is expected to eat, right? That's correct. But here's why I think you don't need to breach that, and you're correct. We could have had a much better developed record. USDA lives in these plants. Everything is controlled by FSIS. Everything is submitted. I mean, this is a highly controlled and reassuring process. Well, it is, except that – excuse me – doesn't the approval of the label itself say the sketch is approved subject to compliance with the PPIA? It does say that. So what does that mean? Does that mean that the approval of the label does not signify compliance with the PPIA? No, I don't believe so, Your Honor. I think what it means is you've had the label approved and you're going to have to continue to comply with the law. But here's why I don't think we get to that point, why we don't need a factual development in the record. And we'd be happy to do that, but it's this. The packaging says there are six cans with 12.5% net weight. We know that's 75 ounces. We know from the back of the label, and, yes, it's on the back, but it is there that there are 42 ounces of drained chicken meat in this six-pack. Yes, we know that not because it says that anywhere, but because someone has to do some math and figure that out, right? That's right, Your Honor. Simple math maybe, but math. Yeah, that's correct, Your Honor. But it is much more simple than what they're proposing. What they're saying is that the consumer would be better off if it said 50% chicken, and so then the consumer has to do this. What they're saying is that the reg draws a line at 80%, and if you've got essentially less than 80% solid, you've got to more prominently disclose the relative percentages. That's in the preparation process, not to the percentage when the can is open. That's the difference. And how do we know this is preparation? Why should we make a legal ruling that the preparation process refers to the cooking of the chicken before it goes in the can rather than to what is actually in the can? The regulations, as I read it, say preparation includes blah, blah, blah, blah, and canning. So why isn't what matters to the consumer not how much chicken there was before it went in the can, but how much chicken they're buying? Well, that's true, and I'm not sure the purpose of that regulation relates to consumer disclosures. But, again, if you'll permit me, I'd like to go back to this one point, and that is a very simple one. There is information on the front and back of this package that would allow the consumer to understand there is 75 ounces of chicken and water, and that of that total, only 42 ounces is drained chicken meat. The consumer has that information at hand. Two times 21 is a lot easier calculation than the one that they would have you employ, which is, okay, there's 56%, so now I've got to multiply 6 times 12.5 net ounces per can. That gives me 75. I take 56% of that, and that gets me back to 42. Their disclosure that they're suggesting to the court is much more complicated. It is not helpful, and, in fact, it is cumulative of all the information that's already there on the outer package of the container. Can I ask one other question? Because we've been focused on the substantive compliance issues, you really haven't gotten a chance to talk about preemption as such, right? So I'd be interested in understanding what it is that is inconsistent between what they're asking or what they're asking us or a jury or a judge below to decide is misleading under state law. What is inconsistent between that and the federal regulation? How are they asking for more than the federal regulation requires? Because, and this is an important point, this is where the district court ultimately came down, he said forget about whether this is an authentic copy of this filing with the Food Safety and Inspection Service. We know they are not challenging the fact that it was approved, and the label as submitted was approved. And so what they're suggesting is that by not, interestingly enough, not as a function of state law, but they're trying to pull in these Table 2 requirements, using that as a predicate for the state law claim, but their result here, the relief they seek, would clearly call for this label to be altered and changed. They want that 56% or 44% water disclosure on that label. That makes it a different label, and that is why it is expressly preempted. Okay, so it's preempted by the approval is really the key. Correct, and that's what the cases say. The cases say that if there is an approval by the Federal Safety Inspection Service, I'm sorry, Food Safety Inspection Service, then that constitutes sufficient approval for purposes of express preemption. But that would not preempt a state claim that's based on more than the label. That's correct, Your Honor, and that's the thing that we want to emphasize here. The states are free, entirely free, to provide any kind of remedy that they want for fraudulent labeling. However, in the case where the label is explicitly approved by the USDA and its division, FSIS, then those claims are not allowed on preemption grounds. But the states are free to provide whatever remedy they want for fraud, other aspects of fraud in connection with a marketing program. But that remedy could be through a private civil lawsuit. It's not limited to a regulatory action. That's correct, and the only problem here, I mean, yes, the states have concurrent jurisdiction, yes, they have the ability to provide for claims, a common law for dealing with these issues. The only problem here is that they pick the claim where the label is very clear and no reasonable consumer could say, I didn't know that I had 42 ounces of drained chicken in this package. That's what it says on the back. And, Mr. Withrow, would you have any objection to our asking the Department of Agriculture to weigh in on what they think about this preemption issue? Not at all, Your Honor. We did that in Marentetti, as I recall, and as it turned out, it wound up being very helpful to the defendant because the Department of Agriculture agreed with their argument and laid out much more information about how the approval processes worked in that case. I think it had to do with organicness than we had going in. No, we would welcome that. This process is owned by the federal government. The client wants nothing other than, these people, as I say, they're there every day in the plant. They just want somebody to tell them what to do, and that's what they think they've done here. May I ask this? This goes presumably well beyond the record, but I can't resist asking, why is there so much water? You know, I really wish I knew the answer to that. All I know is that once the product is put in the can, again, it is cooked and it is chilled, and then those contents are put in, 83.3% of meat, which is injected with marinade, so there's going to be some moisture in there, but that's 83.3%, and then the rest of the ingredients are put in. Then the can is sealed, and then it's heated to give it this incredible shelf life that it enjoys. That's the process. And so you start with 83.3%, and after you open the can, you get to 56.6%. And there's really nothing you can do about that process. I mean, it's going to look like that every time. Okay? Thank you. Thank you so much. Mr. Inslee-Pruitt. Mr. Inslee-Pruitt, would you have any problem with our asking the Department of Agriculture for their views? No, not your Honor. I think it's important to start at kind of the last point that we discussed there regarding the preemptive effect of the agency's review of its own regulation. Now, again, I mentioned this before, BASE versus Dow regarding the FFRA statute as evaluated by the EPA. And the Supreme Court there found it was pretty clear that a state court action would not be preempted as long as it was equivalent to in the standards that the FFRA required. Now, other cases have found similar results. For example, in Vedtronic versus Lohr, the Supreme Court evaluated a substantial equivalency on the FDA. In Riegel versus Vedtronic, they then did a new product evaluation. But in Riegel versus Vedtronic, Justice Scalia noted that it was a very rigorous review in that case. It was 1,200 man-hours that found a new device-specific regulation that was applied in that labeling approval. The label approval here I don't think rises to that effect where it is a product-specific regulation in and of itself in that review. The regulation is the generic requirement that's in the CFR. So to the extent that this case were to live another chapter and we'd be moving to discovery, would the discovery consist in part of an assessment of what the regulatory review consisted of? I believe so, and in part what was discussed with the USDA. And I think it's also important to look at the FSIS's structure as a whole, perhaps we'll learn more about it, but here the FSIS has determined that they're overwhelmed. They've got more than 100,000 labels a year that go through, and as a result... You're not suggesting that there's any fraud in connection with how the presentation was made by Costco to the FSIS? I have no basis to do that at the moment, Your Honor. But here the FSIS has realized that because of the volume of labels that they are reviewing, manufacturers do not always have to actually submit the label. If they do not have a specific health claim on the label, here there's a claim regarding the healthiness, and so it was submitted to FSIS under regulation, or defendants have said that it was. If it does not have that special claim, a large number of those labels are never sent in, and so it is a regulatory review that is never reviewed. And so defendants' argument here... But whose front was, though? This one was, but if you were to accept defendants'... Well, I'm sorry, defendants have said that this one was, and I have no reason to believe it wasn't, but I don't want to concede that point. So accepting defendants' argument here, this entire structure would preempt any claim against a vast number of labels that were never seen by anybody because it was supposedly reviewed, because FSIS has determined that that is how they want to set it up. But whose problem is that? I'm sorry? Whose problem is that? I mean, frankly, it may well be a consumer problem. Your argument is then therefore you have to let the states regulate it? Well, at that point, it does not become a determination of the force of law that should be preemptive. For example, in United States v. Meade, the court found that when the Customs Service was making a determination about how to apply the tariff, they said 10,000 to 15,000 label or determinations a year was a very large amount that strained the credibility that that could be considered the force of law. Here, if you have such a large volume, where they're not even seen by the agency, that should not be a force of law event. But I don't see why... I don't think they're arguing that if they didn't have the heart-healthy label and, therefore, they didn't have to and did not submit it to the FSIS, I don't hear any claim by Costco that then the determination would have the force of law. That would be a non-determination. In their case, they did submit it for whatever kind of review it is. I mean, we don't know anything about that. And we are being asked to make a certain leap. I appreciate that you don't have any reason to think it wasn't. I don't have any reason to think it wasn't. I assume it was, but that's just an assumption. We're being asked to take judicial notice of the idea that this was... And throw out your lawsuit on the ground that this label was approved by the FSIS when the complaint doesn't say so, and the reason we're supposed to take judicial notice of it is just, hey, we sell it, so it must have been approved, because the law requires it to be approved, which is an interesting claim. But I don't think they're making the claim that anything that appears on any can is constructively approved by the FSIS, even if it was not submitted. Well, they haven't said that it's not their claim. And I think that's the implication of their claim, that because it's gone through the process the FSIS has set up, that it would be preempted. I can't put words in their mouth. But... But that is the way that I read the argument. And while they've highlighted the fact that they claim that it was reviewed, that is not necessarily determinative, but rather there's a regulatory structure in place. Apart from understanding what was before FSIS, what was not before them, and what they did, what else would discovery, in your view, consist of? Well, it sounds like we have an interesting issue regarding the preparation of the can itself. Again, this is more detailed than I've heard before, and this is something that defendants have conceded would be necessary to go through discovery to determine that the preparation was actually in compliance with the regulation. Other information that I might like to seek in discovery would be regarding whether or not Costco had any internal documents with respect to whether or not consumers were misled. There are other things that are related to the state law claim, such as the number of cans that were sold. There's a lot of other issues that would be... How do you decide what is an appropriate amount of water with which to flood the can? I mean, I buy tuna fish packed in water, and it's in a little can like this, and once upon a time it was seven ounces, but you know how that goes with inflation. Now it's about five, but it just has enough water to kind of cover the tuna fish in the can. And it would be interesting, wouldn't it, to you, to know how the decision was made that this needed more water, and did it need more water than just what would cover the meat and keep it wet? I actually do have some interest in industrial processes and how these things happen. Yeah, me too, but that's not the point. I think the question is would we be interested in knowing that with respect to whether there was some misleading going on if there is no function to the water actually as compared to if there is some necessity that there be that much water in the can in order to accomplish the preservation and so on. Yes, John. Thank you. Thank you both. We'll reserve decision, but helpful arguments, and you will see, be copied, of course, on something from us to USDA and go from there.